UNITED STATES of America,
Plaintiff,

v.

CENTRAL MOTOR LINES, INC.,
a corporation, Defendants.

Civ. A. No. 2521.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Dec. 23, 1971.

See, also, D. C., 325 F.Supp. 478.

534

Stuart P. Herman, Harvey Knudson, Jr., Squire Padgett, David L. Rose, David Norman, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

W. P. Sandridge and Charles F. Vance, Jr., Winston-Salem, N. C., Francis M. Fletcher, Jr., Charlotte, N. C., Hugh J. Beins, Washington, D. C., Marvin Gittler, Chicago, Ill., for defendants.

## FINDINGS OF FACT

McMILLAN, District Judge.

### I. *Introduction and General Findings*

1. This suit was instituted by plaintiff, United States of America, seeking relief for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

2. Central Motor Lines, Inc. (hereinafter "Central") is a corporation organized under the laws of the State of North Carolina, with corporate offices in Charlotte, North Carolina. Central is engaged in the business of local, intrastate and interstate transportation of goods and merchandise by truck. Central maintains and operates terminals in Charlotte and Greensboro, North Carolina.

3. Defendant Central is an employer engaged in an industry affecting commerce within the meaning of Section 701 (b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

4. At Central's Greensboro, North Carolina terminal, Local Union No. 391, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereafter referred to as Local 391) represents the following employees as their exclusive collective bargaining representatives in the following collective bargaining units (hereafter referred to as bargaining units) and under the following collective bargaining contracts (hereafter referred to as contracts):

(a) The East Line road drivers under the National Master Freight Agreement and the Carolina Freight Council Over-the-Road Supplemental Agreement (hereafter referred to as Carolina Road Agreement) effective from April 1, 1970 to June 30, 1973, in a nationwide multi-employer—multi-union collective bargaining unit of road and city employees in the trucking industry.

(b) The city and peddle drivers, switchers and checkers, under the National Master Freight Agreement and the Carolina City Cartage Supplemental

Agreement (hereafter referred to as Carolina City Agreement), effective from April 1, 1970 to June 30, 1973, in a nationwide multi-employer—multi-union collective bargaining unit of road and city employees in the trucking industry.

(c) Maintenance employees under the Carolina Automotive Maintenance Agreement (hereafter referred to as Maintenance Agreement) until July 1967, when the maintenance work was moved to Central's Charlotte terminal.

(d) Office clerical employees under a contract between Central and Local 391, effective from May 1, 1971 to July 31, 1974, in a bargaining unit limited to Central's Greensboro office.

5. Local 391 is a labor organization engaged in an industry affecting commerce within the meaning of Section 701 (d), (e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(d), (e).

6. At Central's Charlotte, North Carolina terminal, Local Union No. 71 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereafter referred to as Local 71) represents the following employees as their exclusive · collective bargaining representative in the following bargaining units and under the following contracts:

(a) The East Line road drivers under the same Agreements as Local 391.

(b) The city and peddle drivers, switchers and checkers, under the same Carolina City Agreement as Local 391.

(c) Maintenance employees under the Maintenance Agreement effective from April 1, 1970 to June 30, 1973, in a multi-employer—multi-union bargaining unit of maintenance employees in the trucking industry in the States of North and South Carolina.

(d) Terminal office employees under a contract between Central and Local 71, effective from May 1, 1971 to July 31, 1974, in a bargaining unit limited to Central's Charlotte terminal office.

7. Local 71 is a labor organization engaged in an industry affecting com-

merce, within the meaning of Section 701(d), (e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(d), (e).

8. Local Union No. 710 International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereafter referred to as Local 710) is the bargaining representative for all west-board over-the-road drivers employed by Central at its Greensboro and Charlotte terminals. Local 710's headquarters is in Chicago, Illinois.

9. Local 710 is a labor organization engaged in an industry affecting commerce, within the meaning of Section 701 (d), (e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(d), (e).

10. The only employees of Central represented by Local 710 are the west-board over-the-road drivers who are covered by the National Master Freight Agreement and the Central States Area Over-the-Road Supplemental Agreement (hereinafter referred to as Central States Agreement) effective from April 1, 1970 to June 30, 1973. The Central States Agreement was negotiated between Local 710 and unionized trucking companies with facilities in Chicago including Central.

11. Central employs over-the-road drivers at its Greensboro and Charlotte terminals. The drivers are divided into two groups, those that run East, primarily to New York, and those that run West, primarily to Chicago. The East Board also includes 13 shuttle drivers, ten in Charlotte and three in Greensboro, who carry loads between the terminals in the Carolinas.

12. Central operates two-man sleeper cab trucks for all its over-the-road operation except shuttle drivers. In the sleeper operations one man drives approximately four hours and rests four hours. A Chicago run takes approximately 24 hours one way and a New York run 17 hours one way. All of Central's sleeper teams are domiciled either in Charlotte or Greensboro.

13. Shuttle drivers operate as a single-man operation, but are part of the

East Board over-the-road driver seniority grouping and drive the same equipment as over-the-road drivers.

14. Prior to July 1967, the vast majority of Central's East and West line drivers were domiciled in Greensboro; since that date, the majority of both East and West line drivers have been domiciled in Charlotte.

15. Central also employs city or pick-up and peddle drivers at its Charlotte and Greensboro terminals. A city or pickup driver is one who picks up or makes deliveries within a 15 mile radius of the home terminal. A peddle driver is one whose runs are within a radius of 75 miles of the home terminal but whose round trip cannot exceed 150 miles.

16. Central also employs checkers and switchers at its Charlotte and Greensboro terminals. A checker is a dock worker who checks, stacks, loads and unloads freight at the terminals. A switcher moves trucks to and from the dock but operates equipment only on company property.

17. Central currently operates a Maintenance Shop at its Charlotte terminal for the purpose of repair and maintenance on all trailers, rolling and powered equipment operated by the Company. Prior to July 1967, Central operated maintenance shops in both Greensboro and Charlotte.

18. Central employs mechanics, mechanic helpers, stock or parts clerks and garagemen at its Maintenance Shop. A mechanic is an employee who is capable of building, rebuilding, repairing and maintaining all parts of automotive or trailer equipment. A helper is an employee who works under the direction of a mechanic in the performance of his duties. He also fuels, greases, changes oil, and inspects vehicles. A stock or parts clerk is an employee who issues parts, receives parts and keeps a maintenance and parts inventory. A garageman is an employee who is engaged in tire work and washing and cleaning.

19. Central also employs office and clerical personnel, mainly billing and rate clerks, at its Charlotte and Greensboro terminals. These office and clerical employees are covered by union contracts. The Company also employs a larger number of clerical employees at its Charlotte general office. The clerical employees at the general office are non-union.

20. Central in its absolute discretion determines which individuals will be employed and in what job classification. Locals 71, 391 and 710 are not involved in the hiring process in any way. All employees except for supervisory personnel at the Charlotte and Greensboro terminals, are represented for collective bargaining purposes by one of the defendant locals.

21. Local 391 represents and has some 7500 members, of which less than 100, including blacks and whites, are employed by Central at its Greensboro, North Carolina terminal. Some 15 to 20 per cent of Local 391's members are of the black race. All of Central's employees represented by Local 391 at its Greensboro, North Carolina terminal are members of Local 391. Local 71 represents and has some 4300 members, of which some 300, both blacks and whites, are employed by Central at its Charlotte, North Carolina terminal. Some 16 to 18 per cent of Local 71's members are of the black race. All of Central's employees represented by Local 71 at its Charlotte, North Carolina terminal are members of Local 71.

22. All employees represented by Local 71, Local 391 and Local 710, regardless of race, receive the wages, hours and conditions of employment as provided for in the collective bargaining agreement for the job classification in which they are employed.

23. At the time this lawsuit was filed, and at all previous times relevant to this action, the applicable collective bargaining agreements in Findings 4, 6 and 10 did not give any employee the right to transfer between classifications or contracts. Such transfers were at the sole discretion of Central and under the applicable collective bargaining agreement.

When an individual did transfer he went to the bottom of the seniority list in his new classification for job opportunity, bidding and layoff purposes. This practice is generally prevalent in the trucking industry throughout the United States.

24. In the vast majority of the United States there are separate contracts and seniority for unionized road and city employees in the trucking industry. In many areas, different Local Unions represent the road and city employees.

25. In the few areas which permit bidding by seniority from city to road jobs when vacancies exist, the employee who moves goes to the bottom of the road seniority list. An example of this practice is Washington, D. C. and Baltimore, Maryland, where the vast majority of the employees represented by Teamster Local Unions are black.

26. In New England, Pennsylvania and West Virginia, there is a common seniority list for road and city drivers. The reason for this common list is unconnected with race, but arises from the historical fact that these areas originally did not have road drivers in the sense in which they exist in the Carolinas, i. e., long line drivers who spend a substantial portion of their days and nights away from their home terminals.

27. The Carolinas have the largest concentration of road drivers east of Chicago. The Teamsters Union organized the road drivers separately in the Carolinas and this occurred well before the organization of the city employees.

28. The differences between the different contracts and working conditions of the employees under each contract is highlighted by the fact that in the Teamsters International organization there are different individuals who handle problems under the road and city contracts as distinguished from the maintenance or office employees contracts. The Teamsters Research Department also prepares separate studies for road and city contracts throughout the country.

29. In the Carolinas, the Local Unions, including Local 71 and Local 391, each had separate contracts with each unionized trucking company until 1955. In 1955, these contracts were merged into two area-wide agreements, one for the road and one for the city employees and all unionized trucking companies in the Carolinas. Bargaining on the basis of separate road and city contracts continued in effect until 1964. During that time, the road and city employees had separate bargaining units, separate proposals, separate negotiations, separate meetings and separate ratification votes on their separate contracts. This historical separation is the reason why there are separate road and city seniority lists with no right of transfer since any transfer would have been across bargaining unit lines.

30. In 1964, the trucking industry and the Teamsters Union engaged in their first nationwide bargaining and the Carolina contracts became supplemental to the National Master Freight Agreement. At that time, the road and city bargaining units were merged, although there remained separate contracts and separate seniority lists.

31. The 1964 negotiations between the Teamsters and the trucking industry were concluded in February 1964 and the National Master Freight Agreement was made effective from February 1, 1964 to March 31, 1967. The Carolina Road Agreement was negotiated at the same time, but was not in effect until September 1, 1964 because the prior agreement in the Carolina expired at that time.

32. In 1967, the first negotiations after the effective date of Title VII of the Civil Rights Act of 1964 the Local unions in the Carolinas, including Local 71 and Local 391, proposed, without success, bidding between the Carolina City Agreement and Carolina Road Agreement although without seniority carryover.

33. The 1964, 1967 and 1970 negotiations occurred on a multi-employer— multi-union basis and at no time did Local 71, Local 391, Local 710 or Central negotiate, or have the legal right to negotiate, separately with each other on any

subject, including equal employment opportunity. There are a substantial number of employers who are involved and a party to the Carolina Road Agreement and Carolina City Agreements.

34. In April 1970, the Carolina City Agreement was changed to provide for bidding between the classifications of checker, switcher, pick-up or city driver and peddle driver when there is a need for an additional employee in a classification. Under the 1970 change, the senior employee bidding, if qualified, is allowed to transfer to the new classification and carry his terminal seniority for job opportunity, bidding and layoff purposes.

35. Under the 1970 change in the Carolina City Agreement, when a layoff occurs in a classification, the employee with the least terminal seniority in that classification is bumped out; however, that individual may bump the junior man at the terminal who is working under the Carolina City Agreement.

36. Under the applicable collective bargaining agreements, there is still no right to transfer between a Carolina City Agreement classification and an over-the-road driver classification. Such transfers remain at the discretion of Central and when an employee transfers, he goes to the bottom of the seniority list for all purposes but fringe benefits such as vacation length.

37. All employees at the Central Charlotte Maintenance Shop in the mechanic, mechanic helper, stock clerk and garageman categories currently work under the Carolina Automotive Maintenance Agreement. Prior to 1958, the garagemen worked under the Carolina City Agreement and accrued seniority under that Agreement. In 1958, when Central's mechanics and mechanics' helpers were organized and placed under the Carolina Automotive Maintenance Agreement, its garagemen, without their consent, were taken out of the Carolina City Agreement and were also placed under the Carolina Automotive Maintenance Agreement.

38. The Carolina Automotive Maintenance Agreement is separate and distinct in all respects from the Carolina Road Agreement, Carolina City Agreement or Office Agreement including the employees and the employers involved, the negotiations, the bargaining units, the proposals, ratification votes and the expiration dates.

39. With but one exception, in the United States the Maintenance Contracts and seniority for maintenance employees in the freight industry are negotiated separately and are separate from the Road, City and Office Contracts. In many areas, the separate community of interest of the maintenance employees is characterized by the fact that they are represented by their own Local Union which does not represent road or city employees; some of these Locals are not even affiliated with the Teamsters.

40. Unlike the road drivers and the city employees who were organized in the 30's and late 40's respectively, the first Maintenance Contract in the Carolinas was in 1955. From 1955 to 1958, there were individual contracts with each employer and union. In 1958, the first area-wide multi-employer—multi-union Carolina Automotive Maintenance Agreement was negotiated.

41. Central's maintenance employees in Greensboro and Charlotte were organized by Local 71 and Local 391 pursuant to a National Labor Relations Board election and certification in 1958.

42. Until 1970, the Carolina Automotive Maintenance Agreement has always had a different expiration date from, and has always been negotiated subsequent to, the Carolina Road Agreement and Carolina City Agreement and negotiations. In 1961, the maintenance employees had a strike but this did not involve the road or city negotiations. In 1967, the road and city employees lost 3 days of employment due to a dispute during negotiations. The maintenance employees also lost work but unlike the road and city employees their grievance resulted in an arbitration which ordered that they be paid lost wages.

43. No maintenance employee has ever suggested or contended to Local 71 or Local 391 that there should be a union proposal or a provision in the Carolina Automotive Maintenance Agreement that maintenance employees be permitted to bid to jobs covered by the Carolina City Agreement or Carolina Road Agreement.

44. Between 1958 and 1969, Central's Maintenance Shop consisted of three departments: General Repair, Trailer and Parts. The first two included in them the job classifications of mechanic, mechanic helper and garageman. Under the Carolina Automotive Maintenance Agreement, individuals who were qualified had the opportunity to be promoted from one classification to another within a department. In the event the Company and Union could not agree on whether an individual was qualified for promotion, it was submitted to a Qualification Committee established by the collective bargaining agreement. An individual promoted within his department carried his seniority for job opportunity, bidding and layoff purposes.

45. In 1969, Central, with the consent of Local 71, established a separate department called "garagemen" and removed the job position from the General Repair and Trailer Departments.

46. In 1970, the Carolina Automotive Maintenance Agreement was changed to permit garagemen to bid on all helper vacancies whether within the same department or not. However, if a qualified garageman once turned down an opportunity to transfer, he lost all future rights to do so during the three-year term of the contract. Secondly, a transferee becomes junior man upon transferring into a new department for job opportunity, bidding and layoff purposes.

II. *Specific Findings*

47. On March 31, 1970, Central employed 287 over-the-road drivers at its Charlotte and Greensboro terminals. Between July 2, 1965 and March 31, 1970, Central hired 96 new over-the-road drivers who had completed the 30-day probationary period and obtained a position on the Company's seniority list. In addition, the Company allowed four drivers to transfer from Carolina City Agreement jobs to over-the-road jobs. Between July 31, 1970 and September 4, 1970, Central added seven more over-the-road drivers to the East Board at the Charlotte terminal. Two of these were transfers from classifications under the Carolina City Agreement, one was a transfer from the West Board, one had previously been approved for driving and one was a rehire.

48. All of the over-the-road drivers referred to in Finding No. 47 are white.

49. Pursuant to this Court's Preliminary Injunction Order of October 15, 1970, six blacks were added to over-the-road drivers, four on the East Board and two on the West Board. Two of those transferred to the East Board resigned within 30 days. Both of those transferred to the West Board resigned within 30 days. Each returned to his former job. Although not required by this Court's Preliminary Injunction Order Central tested Robert Alexander, a black who had previously failed the city driving test, and upon his passing the test, transferred him to the East Board to fill one of the vacancies there. Central also, after exhausting the list of employees suggested by the plaintiff as employees who should be considered first, went beyond the list and transferred another black from the maintenance contract to over-the-road work on the East Board, also filling another of the vacancies on the East Board. The vacancies on the West Board occasioned by resignation of the two blacks transferred to that board were not filled. Thus, Central transferred eight blacks to over-the-road jobs but only netted four blacks who elected to remain in over-the-road driving after the 30 days prescribed in this Court's order.

50. The blacks referred to in Finding No. 49 were the only black over-the-road drivers hired by Central in the past 25 years.

51. Central has a requirement that an over-the-road driver applicant must have

"three full years" of tractor-trailer road driving experience or its equivalent. An applicant who does not have this experience is not processed further.

52. Central claims this requirement has existed as early as 1952 and that the Company has not hired and trained drivers with little or no experience.

53. Despite its requirement mentioned in paragraph 51, Central has whites currently working as road drivers who were originally hired with less than three years' driving experience and trained by Central. For example:

(a) Hubert K. Almond was hired in 1953 with no truck driving experience at all. He was originally allowed to make runs as a "third man" in the truck in March 1953 to gain experience and then was added as a regular over-the-road driver in April 1953.

(b) Thad Loggins was hired in September 1952 with six months' tractor-trailer experience and two years of truck experience. His application states, "This man must ride with an experienced driver for a period of 90 days".

(c) Billy Dillon was hired in August 1955; his application lists three years of experience "extra driving" during which he drove approximately 10,000 miles while working full-time as a fixer in a hosiery factory. Full-time road drivers average approximately 2,000 miles a week or almost 100,000 miles a year.

(d) Robert Green was hired in October 1965 with two years' driving experience while driving 80,000 miles.

(e) Howard Money was hired in June 1966 with 30 months' driving experience while driving 250,000 miles.

(f) Robert Hartwick was hired in September 1966 with 15 months' driving experience, while driving 150,000 miles. Hartwick also lied on his application form about his arrest record and drinking problems but was retained as a road driver.

54. The actual determination of whether an applicant has the requisite experience to be considered for an over-the-road position is made by the initial interviewer in Central's dispatch office. There is, in fact, no mandatory driving experience requirement and the dispatch personnel exercise their discretion as to who is to be considered and hired.

55. On March 31, 1970, Central had as regular employees 25 pick-up and peddle drivers at its Greensboro terminal. Between June 30, 1965 and October 12, 1968, Central added one pick-up driver and transferred one switcher and one checker to peddle driver at Greensboro. All of these drivers are white. Since that date the Company has not added any additional pick-up or peddle drivers at Greensboro.

56. On November 16, 1970, Central had as regular employees 23 peddle drivers and 24 city drivers at its Charlotte terminal. One city driver and one peddle driver are black; the rest of the drivers are white.

57. Between June 30, 1965 and March 31, 1970, Central added seven city and 14 peddle drivers at its Charlotte terminal. All were white.

58. The two black drivers referred to in Finding No. 56 are the only black drivers Central has ever employed on a regular basis prior to this Court's Preliminary Injunction Order of October 15, 1970.

59. Neither of the blacks referred to in Finding No. 56 were originally hired as drivers but were transferred into that classification by the Company in November 1957. One was previously classified as a switcher and one as a stevedore and both, while so classified, had done some city or peddle driving.

60. J. K. Hall, Central's general manager in 1957 and now president, in a memorandum at the time of their transfer to driving, stated that the two blacks were qualified drivers but ordered Company officials: "If the requirements of the jobs referred to above change in any way or the jobs are discontinued, you are to check with me personally to clear their qualifications for any job other than

switching." One of these blacks is still a city driver; the other is still a peddle driver.

61. Central's corporate officials have not historically played a role in determining qualifications of white applicants for driving jobs. Generally this is done by the chief dispatcher.

62. On November 16, 1970, Central had as regular employees at its Charlotte terminal 78 checkers, of whom 56 were black and ten switchers, of whom five were black.

63. On November 16, 1970, Central had as regular employees at its Greensboro terminal 26 checkers, of whom 22 were black, and three switchers, all of whom were white.

64. The current president of Central has stated to Central employees on at least two occasions that blacks would not be considered for driving jobs.

(a) In 1964, Hall told black garagemen in Greensboro that blacks could upgrade to any job in the Company except a sleeper job.

(b) In April or May 1966, at a meeting with a black employee who had filed a discrimination complaint with the Equal Employment Opportunity Commission, Hall told the individual that he could drive extra for the Company but that he was the only black who would have the chance since customers would not accept black drivers because they do not fix themselves up.

65. Based on the following experiences of qualified black applicants, employees or former employees at Central, this Court concludes that blacks have not been considered for driving jobs on the same basis as whites:

(a) (1) Marcus Black has been an employee of Central since 1954. Although classified as a switcher, he was assigned to driving on a "as needed" basis from 1956 until 1958. Between 1958 and 1964, when he was finally told to stop seeking a transfer by Company officials, Black on numerous occasions unsuccessfully sought to be transferred to a driving job at Central.

(a) (2) In early 1966, Black and James Quick, another black switcher, again sought a driving job. After receiving no response from Central and seeing several whites hired as drivers, Black filed a discrimination complaint with the Equal Employment Opportunity Commission.

(a) (3) On March 15, 1966, Central reclassified three white drivers from casual driving jobs to regular driving jobs on a "rush" basis. Just before this, one driver had been transferred to shuttle driving. Company officials were informed that it was their responsibility to decrease the use of "casual" drivers with the hiring of the three full-time drivers.

(a) (4) On May 9, 1966, Black was called to a meeting of company and union officials. He requested a job as over-the-road driver or shuttle driver. Central's President, Mr. Hall, told Black and Black knew independently that Central planned in the near future to consolidate much of its Greensboro operation at a new terminal in Charlotte and that if Black were given at the time of the conference an over-the-road driving job or a shuttle driving job, he would go to the bottom of the seniority list by reason of the union contract. Central's President stated that he would not recommend the transfer to Black for this reason, as he might be laid off. If Black had transferred and had been laid off, he would have had no claim on his previous job. Some problems that Black might encounter as the first black to occupy an over-the-road or shuttle driving job were discussed. The meeting was entirely pleasant and the meeting broke up with Black saying he wanted to think about the proposal. At the meeting Hall asked if the union had any objections to Black becoming a driver. The union official stated that it had no objections and added that the union was not involved in hiring. He did suggest that any driver's job should be offered to and bid by, city employees on a seniority basis. Hall did not respond to this suggestion.

(a) (5) Black was told not to say anything to anybody about the meeting, and to inform Central in writing the next day as to what he was going to do.

(a) (6) The next day, Black wrote Central a letter saying that he would accept the offer but asked the Company to post a certified check for $55,239.93 which Black said was equal to his wages for the previous ten years in case Central reneged on the offer. Central officials did not ask nor did Black tell them how he arrived at that figure. Black testified that the reason for the surety request was the treatment he had received in the past, the fact that he would have to resign his switching job and give up his security without a guarantee of regular employment, plus statements he had heard that Company officials had made about Central's policy of keeping blacks from driving jobs.

(a) (7) Black never received a reply to his letter and was not given an opportunity to drive until after this Court's Preliminary Injunction Order of October 15, 1970. He is now employed as a road driver.

(a) (8) Central has never attempted to discourage a white seeking to transfer to driving, and individuals who desire to transfer have quit and have been rehired as regular drivers the same day, but have gone to the bottom of the seniority list for bidding and lay-off purposes.

(a) (9) Pursuant to Section 706 of Title VII, Black, prior to the filing of this suit, filed a private class-action suit against Central Motor Lines in this Court, Civil Action No. 2152. By order of this Court dated August 19, 1970, trial in Black v. Central Motor Lines was postponed until after the disposition of this case.

(b) (1) James Quick has been employed at Central as a switcher since September 1957. Between 1958 and 1963, he also on numerous occasions requested a driving job from Company officials. He finally was told by Central not to attempt to bid to driving since he was bidding out of classification.

(b) (2) In late 1965 or early 1966, Quick, along with Marcus Black, filed slips again requesting a change of classification. When he received no response from the Company, Quick did not file a complaint with EEOC as Black did and heard nothing further from Central about driving until after this Court's Preliminary Injunction Order of October 15, 1970. Quick was offered and accepted a road driving job on December 2, 1970. After 27 or 28 days on this job, he quit and went back to his former job feeling he was now too old to be a road driver.

(b) (3) In the interim, however, Quick helped two young whites with their driving. One Fred McCoy had no previous driving experience, but was hired as a casual driver in December 1968 after being trained by Mr. Quick. McCoy was put on as a regular driver in April 1969.

(c) (1) James Springs is an experienced black truck driver. He was employed as a casual dock worker at Central between 1959 and 1965. Springs asked the Charlotte terminal manager for a driving job after being told there was no casual dock work because of a lack of drivers. His request was ignored.

(c) (2) Springs asked Company officials on six to eight other occasions in 1966 to be allowed to drive. He was finally given the road test on June 22, 1966. The test was given to him, not by a regular Company official, but by L. H. Fuller, a mechanic in the Garage. Out of 200 points, Springs was given 86, a failing grade. He has never been allowed to operate Central equipment.

(c) (3) The next day Springs went to another trucking company where he was tested and passed on the same equipment that Central uses. He was hired as a casual driver and his first stop that day was at Central's Charlotte terminal.

(c) (4) Springs was subsequently hired as a regular checker by Central in August 1967. He is so employed today.

(c) (5) Springs was offered a road driving job following this Court's Preliminary Injunction Order of October 15, 1970, and declined the offer.

(d) (1) Roger Brown was hired by Central as a casual stevedore in 1962 and has been a regular checker since 1965. He did not list any driving experience on his employment application form. On four different occasions between 1966 and 1969, he inquired of Company officials about a local or over-the-road driving job and advised them of his driving experience but was never considered.

(d) (2) Pursuant to the Court's Preliminary Injunction Order of October 15, 1970, Brown was tested, found qualified and hired as a road driver on November 2, 1970. He is now employed as a road driver.

(e) (1) Lonnie Raleigh has been employed as a stevedore and then checker at Central's Greensboro terminal since 1956. He asked Company officials about a driving job shortly after his employment and was told that blacks would not be considered for the job. About two months later, as shop steward for the stevedore classification, he asked again. The Greensboro terminal manager told him that as long as he was terminal manager, there would never be a black driver. Both of these statements were made prior to 1959. However, there has never been a black driver at the Greensboro terminal.

(e) (2) In 1970, Raleigh was laid off from his checking job due to a strike in the industry. He asked the terminal manager if he could bump a driver with less seniority and avoid a layoff as provided for in the 1970 collective bargaining agreement. He was given a physical examination, but the doctor found him "not qualified until diabetes checked out". The terminal manager said he would consider it, but instead the next week Raleigh was called back to work as a checker.

(e) (3) Following this Court's Preliminary Injunction Order of October 15, 1970, Raleigh was offered an over-the-road driving job. He expressly declined on October 24, 1970.

(f) (1) Sherman Harris is an experienced black truck driver. In May 1969, he was hired as a casual dock worker at Central when the Company he was working for went on strike. After a few weeks, he was allowed to drive on a casual basis and averaged about three days a week.

(f) (2) On several occasions between September 1969 and June 1970, Harris asked Company officials about a regular driving job. He was never given any encouragement and was advised in June to go back to his former company since Central had no openings and he could not get on regular. Harris returned to his former job when the strike ended in late June since he felt that he was getting the runaround from Central. Between July and September 1970, Central hired seven white drivers.

(g) (1) Robert Alexander has been employed at Central since 1956. In 1961, after being transferred from stevedore to checker, he was laid off due to his inability to carry his seniority from the stevedore to checker classification. He asked the terminal manager if he could have a driving job in lieu of layoff. The terminal manager said he was about to put Alexander back on regular and would let Alexander know. Alexander heard nothing further from the terminal manager about driving.

(g) (2) Alexander remained a checker until 1970. In 1970, he was given a road test for City Driver which Company officials said he failed. Pursuant to this Court's Preliminary Injunction Order of October 15, 1970, Alexander was tested for road driver, found qualified for road driver and is now employed as a road driver. Alexander was not one of the original six black employees of Central who were given over-the-road jobs in 1970. After James Massey and Theodore Pearson, both blacks, gave up their over-the-road jobs within the 30-day period allowed by the preliminary injunction order and went back to their

previous classifications, Alexander took the place of one of them on the East Board and is now one of the four black over-the-road drivers. He is one of the black persons writing a letter to Central under date of November 19, 1970, expressing appreciation "for the smooth and pleasant way in which Central Motor Lines has begun to integrate minority employees into all phases of its operation." Alexander genuinely meant what he said in the letter.

(h) John McLeod, an experienced black truck driver, during June 1962 heard that Central was hiring drivers. He telephoned Central and was told the Company was interviewing and whom to see. McLeod went to the Greensboro terminal within one-half hour of the telephone call but the person he was told to ask for informed him that Central was not hiring and McLeod was not allowed to fill out an application.

(i) Ralph Stanfield, an experienced black truck driver, applied at the Greensboro terminal during the summer of 1962 or 1963. He was given an application form which he filled out, but was not tested or otherwise interviewed. He called back subsequently on two occasions but was told that nothing was open. He stated in testimony that he does not want an over-the-road job unless it is a short haul like Baltimore.

(j) Roosevelt Blackwell, an experienced black truck driver, applied for a driving job at Central on five or six different occasions between 1963 and 1967. He was never allowed to fill out an application and was never considered for employment. Central claims that it has been their procedure for the past five years to allow all applicants to fill out an application form which is kept on file and becomes the source of future hires.

(k) Richard Williams, an experienced black truck driver, applied at the Charlotte terminal on three occasions between December 1970 and January 8, 1971. He had heard, pursuant to this Court's Preliminary Injunction Order, that Central was hiring black drivers. He was told by the dispatch office that there were no openings and that Central was not taking applications. He was not allowed to fill out an application. However, Central has hired no over-the-road drivers except those pursuant to this Court's Preliminary Injunction Order since Williams applied.

66. Central has initially assigned *all* black employees whom it has hired into the Maintenance Shop, regardless of qualifications, to garageman jobs while whites with no mechanical experience were consistently hired as mechanics' helpers. These whites were subsequently trained by Central to be mechanics and many are so employed today.

67. Central currently employs eight garagemen, all are black, and they average almost 14 years' Company seniority.

68. John Scott and Ernest Scott are two garagemen who are qualified for upgrading. Both have trade school training in mechanical work and 18 years' seniority at Central. In 1966, Central officials listed John Scott as being qualified for promotion. Both have unsuccessfully sought promotion on several occasions during the past five years.

69. James Springs, who is the same James Springs referred to in paragraph 65(c), was an honor graduate of the Army's mechanics school. He was originally hired at Central in 1959 as a casual dock worker. In August 1966, Springs applied for a mechanic helpers's job. A white with no prior work history at Central and no mechanical experience was hired for the job.

70. Between January 24, 1965 and July 14, 1967, at the Greensboro terminal, two black garagemen were upgraded to mechanic's helpers and one black to parts clerk. This was the first time blacks had worked as other than garagemen at either of Central's maintenance facilities. Such upgrading occurred only after the garagemen and the Local 391 shop steward complained that inexperienced whites were being hired

as helpers and the garagemen not given an opportunity to upgrade.

71. On July 14, 1967, the Charlotte and Greensboro shops were both closed and merged into a new shop at Central's new Charlotte terminal. The Greensboro maintenance employees through Local 391 had requested that the seniority lists be dovetailed, but at the time of this merger, all former Greensboro employees who came to Charlotte were given a position on the combined seniority list, below employees from the old Charlotte terminal, for all purposes except vacation period selection and layoff. Central took the position in the grievance proceedings that it hoped the employees would agree to dovetailing but could not force them to do so.

72. In the Greensboro to Charlotte change of operation involving East Board road drivers which occurred at the same time as the maintenance change, Local 391, which represented the Greensboro employees, contended that the employees should go ahead of the Charlotte drivers represented by Local 71. Local 71 took the opposite position. The joint employer-union grievance committee established under the Carolina Road Agreement ordered that the Greensboro road drivers be placed at the bottom of the Charlotte road drivers' seniority list for bidding, but be given their overall seniority for layoff purposes. Local 391 appealed to the National Grievance Committee on the grounds that a question of interpretation existed, but the Committee denied the appeal. All the road drivers were white.

73. The former Greensboro maintenance employees through Local 391 also took the matter to grievance where the Joint Bi-State Committee ruled that the Carolina Automotive Maintenance Agreement did not provide for dovetailing without unanimous agreement.

74. The United States has asked this Court to find that the refusal to dovetail the seniority lists by Local Union No. 71 and the Charlotte maintenance employees was in part due to this hostility toward the willingness of the Greensboro shop employees and the efforts of the Greensboro union steward to seek equal employment opportunity for blacks and the resulting promotion of the three blacks at Greensboro from traditionally black to traditionally white jobs. In light of the contract language and the fact that the all white East Board road drivers were treated in precisely the same manner as the maintenance employees and the United States was unable to produce any evidence of such actual hostility prior to the move, this Court concludes the government has failed to carry its burden of proof on this issue.

75. In October 1967, the former Greensboro shop steward filed another grievance based on Article 5, Section 2 (c) of the Agreement over the failure of the Company to upgrade garagemen at the new Charlotte Maintenance Shop. The matter was dropped on April 9, 1968 when the Director of Maintenance for Central took the position that none of the garagemen was qualified for upgrading.

76. In early 1969, a black garageman filed another grievance based on Article 5, Section 2(c) of the Agreement over the inability of garagemen to be upgraded. The Company and the Union thereupon agreed that five garagemen would be upgraded to helper. The upgrade committee selected two black garagemen, an American-Indian and two whites for upgrading to helper. Five helpers were also upgraded to "B" Mechanic, including the two blacks previously upgraded to helper. This was the first promotion of blacks ever at the Charlotte Mainenance Shop.

77. The three non-blacks upgraded to helper in 1969, Locklear, an American Indian, Gurley and Maynard, were all hired subsequent to the most junior black in the garage and were the only three non-blacks employed as garagemen.

78. As a result of the 1969 upgrading, Central currently employs 30 mechanics and 14 helpers, two of whom, in

each classification, are black and one helper is American-Indian. The Company also employs four parts clerks, all white, and eight garagemen, all·black.

79. Subsequent to the 1969 upgrading, Central transferred all their garagemen to a separate "garagemen" department. Under the applicable collective bargaining agreement, the garagemen lost the contractual right to transfer to a helper classification and, if transferred, to carry their seniority for any purpose other than fringe benefits.

80. The 1970 changes in the Carolina Automotive Maintenance Agreement restored the contractual right of garagemen to advance to helper classification. However, since Central's garagemen are now in a separate department, they are unable to carry their seniority for all purposes other than fringe benefits. This inability to carry their seniority for job opportunity, bidding and layoff purposes has discouraged the garagemen from seeking a helpers' position.

81. Central employs approximately 100 office and clerical personnel at its general office in Charlotte. The Company also employs approximately 30 billing and rate clerks at its Charlotte terminal and eight at the Greensboro terminal.

82. The turnover rate among the office and clerical staff is high, averaging 15 percent a year or more. For example, between January 1969 and September 1970, there were 26 new clerical hires at the Charlotte general office and four during the first 11 months of 1970 at the Charlotte terminal. In earlier years, the tunover rate was even higher.

83. All of the clerical employees referred to in Finding No. 81 at the Charlotte and Greensboro terminals are white. Central has never employed a black in a regular clerical or clerk position at either terminal.

84. The most numerous position among the terminal clericals is billing clerk. There is no educational requirement for the job and most of the billing clerks have been trained by Central to do the work. The only requirement is an ability to type approximately 50 words a minute. Of the 11 billing clerks at the Charlotte terminal, ten have been hired since February 1967. All are white.

85. Central never employed a black at its Charlotte general office prior to September 1964 in any position other than janitor. The Company did not hire its first black clerical employee until June 27, 1966.

86. Between June 27, 1966 and August 12, 1969, the date this lawsuit was filed, Central hired five black office and clerical personnel at its general office. However, prior to August 12, 1969 never more than three blacks were employed there at the same time. At the time of the trial Central had eight black office and clerical personnel there.

87. Central has followed a consistent pattern over the years of hiring whites directly out of high school or with little or no work experience and training them for clerical positions. The Company had never offered such opportunity to a black until the eve of trial in February 1971. Central officials admit that at least in 1966 it considered only black applicants who were exceptionally qualified.

88. Chris Harrison, Jr. is a black who had two years of college business courses and 11 years of shipping and receiving clerk experience when he applied for a job at Central's Charlotte terminal in 1959. Although he sought any job for which he was qualified and listed on his application form that he could type 65 words a minute, he was hired as a stevedore. Harrison remained at Central until February 1961 when he was terminated due to lack of work. No one at Central ever asked if he was interested in an office or clerk job and he never inquired since he was afraid of being fired as a stevedore. Since leaving Central, Harrison has been employed as a route salesman for a beer company.

89. Shortly after the effective date of Title VII of the Civil Rights Act,

Central took the following steps to insure compliance with the Civil Rights Act:

(a) On September 17, 1965, Mr. Joe K. Hall, then Vice President and General Manager, now President of Central, addressed a memorandum to all department heads, all terminal managers and the chief dispatcher advising them of the Company's intention to comply with the Civil Rights Act and executive orders and other laws and regulations relating to it.

(b) On September 17, 1965, Mr. Hall addressed a communication to 25 institutions advising them that employment by Central was open to qualified applicants of any race, creed, color, national origin or sex. Included in this list were the Employment Security Commission of North Carolina and similar agencies in other states where Central had employees; also, numerous commercial employment agencies such as AAA Personnel Service in Charlotte, Dixie Employment Service in Charlotte, Carriker Employment Service in Charlotte, Smith Personnel Consultants in Charlotte, Snelling and Snelling in Charlotte, and APTA Personnel Agency in Charlotte, and similar commercial agencies in other cities where Central has employees.

(c) On September 17, 1965, Central posted the official posters issued by EEOC.

(d) On September 17, 1965, Central posted the printed pledge of equal employment opportunity under § 301 of Executive Order 10925 as amended. All terminal managers were directed to post two notices at their terminals, one where the notice would be seen by persons entering the facility and the other on the bulletin board.

(e) On September 17, 1965, Central issued notices to labor unions of nondiscrimination required under Executive Order 10925, § 301. These notices went to all of the labor unions who are defendants in this case and other labor unions not defendants in this case.

(f) On November 2, 1965, Central's Mr. Hall addressed a second communication to all department heads, terminal managers and the chief dispatcher, changing certain company procedures to insure compliance with Title VII of the Civil Rights Act.

The first change required that all applications should have stapled to them a memorandum indicating whether the applicant was white or nonwhite, male or female. The purpose of this application was to insure that the blacks would be given "preferential treatment" and "special careful consideration".

The second of these required that when the accounting department was notified of a new hiring, a notification should have attached to it a memorandum indicating whether the new hire was white or nonwhite, male or female. The purpose of this was to keep the Company informed as to the progress made in complying with Title VII.

(g) On November 17, 1965, Mr. Hall the third time addressed a communication to all department heads, terminal managers and the chief dispatcher reconfirming the policy of nondiscrimination and specifying that this policy included but was not limited to equal treatment with respect to upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training.

90. With the coming of the effective date of Title VII (July 2, 1965), Central expected a flood of black applicants. They particularly expected this for clerical positions.

91. Blacks did not apply immediately for clerical positions.

92. Because black applicants did not immediately apply for clerical jobs and because of conferences with the compliance officer with the Post Office Department, which supervised compliance by the trucking industry with the Civil Rights Act and Executive Order 10925,

the Company decided that it should go out and actively recruit black clerical employees.

93. Central took the following steps with respect to recruitment of clerical employees:

(a) Mrs. Dell Geddings, Executive Secretary of Central, contacted the Employment Security Commission's office in Charlotte and asked for names of qualified black applicants and was advised by the Commission that it could not racially identify applicants.

(b) Mrs. Dell Geddings personally went to the Employment Security office in Charlotte and asked to look at applications for employment. After an applicant who apparently possessed the qualifications for a clerical job was selected by Mrs. Geddings, the Employment Security Commission could then state the race of the applicant. Mrs. Geddings selected a number of black applicants in this way and immediately, from the Employment Security office, telephoned these applicants, but all had secured other employment or were not interested.

(c) Mrs. Geddings talked with a Mr. George Burkhalter, a representative of an employment agency in Charlotte, and asked him to be on the lookout for qualified black clerical employees and to steer them toward Central.

(d) Mrs. Geddings talked with Mrs. Susan Osborne of the Speer Employment Agency in Charlotte, asking that agency to be on the lookout for qualified black clerical employees and to refer them to Central. Much later, in November of 1970, this agency did refer Janice Connor, a black person, to Central and Central employed her on the day of her application and she is still working for Central.

(e) On one occasion in 1967 when George Moore, a black compliance officer with the Post Office Department, was in Mr. Hall's office, Mr. Hall requested him to refer qualified black applicants to Central. He did later refer Etha Kirkpatrick, who was then, for the second time, offered employment and again declined.

(f) Bernice Chiles, a black person, was referred to Central by Ray Booton, a Post Office Compliance Officer.

(g) Both Mr. Johansen, then President of Central, and Mr. Misenheimer, then Treasurer of Central, contacted Mrs. Westbrook, a black librarian in Charlotte who was well and favorably known in the black community, and asked her to refer clerical prospects to Central. This brought no known result.

(h) Mr. Misenheimer, the Acting President of Central, contacted Johnson C. Smith University, a predominantly black institution, asking it to refer its students interested in clerical work to Central, but this brought no result. Central on another occasion, when much of the Greensboro operations was moved to Charlotte and when there was a need in Charlotte for clerical workers at the new Charlotte terminal, had appealed to Johnson C. Smith University to refer its students to Central.

(i) Central placed 6 job orders with the Employment Security Commission, which resulted in one black hire and one white hire.

94. Black clericals, when employed, were featured along with white clericals in a company publication circulated among company employees. Company picnics were integrated and athletic sporting events were integrated.

95. Between the time in 1966 when Central began making affirmative efforts to recruit black clerical employees, after it realized they were not going to apply, and the time of the trial, it interviewed and took applications from 23 black women for clerical jobs at its central office. It offered jobs to 14 of those 23 and employed 12 of the 14. One of the 12 whom it employed (Barbara Newman) did not report for work. Three resigned and at the time of the trial, eight were working out of a total of 100 clerical employees at the central office.

96. Between July 2, 1965, the effective date of the Civil Rights Act and

August 12, 1969, Central offered regular or in one case extra employment to 7 out of 16 persons or 44% of those who applied for clerical work. From August 1969 to date of trial, Central offered regular employment to all 7 of the black persons who applied for clerical work, and 6 of them appeared for work and were currently employed at the time of trial. During the period from July 2, 1965 until the date of trial, Central offered employment to 109 whites or 51% of all white persons who applied for clerical work. If the 11 whites who had previously worked for Central are excluded from consideration, it offered work to 46% of the white persons who applied for clerical positions. Central has never discharged any black clerical employee at its central office.

97. Margaret Ross and Mable Ford Fulton, black females, had two years of business college and Mrs. Ross had two years of bookkeeping experience at Cannon Mills when they applied at Central on August 28, 1967. Both filled out applications and the Central interviewer indicated on Mrs. Ross' application that she was "very impressive". The two women were told by the interviewer that Central would be in touch. Neither has heard again from Central and the Company did not even make the preliminary effort of checking their backgrounds or references.

98. Three days later, Central hired a white accounts receivable clerk who had no clerical background or experience and had not worked at all in almost 20 years. During the next two months, Central hired four other white office and clerical personnel whose educations and backgrounds were substantially less impressive than Mrs. Ross' or Mrs. Fulton's.

99. Sara McClain, a black female, applied at Central on November 9, 1966 for clerical work. She was hired as an "extra" on July 24, 1967. The Company claims that the delay was due to a lack of openings in the interval. However, three whites with poor references or background were hired as clericals in the interim.

100. Between October 16, 1967, when Sara McClain was put on regular, and January 1, 1969, Central did not hire a black clerical.

101. Between January 1, 1969 and September 3, 1970, Central hired 26 clerical employees, three of whom are black. Since September 1970, Central has hired four additional black clericals and its general office currently has eight blacks among its 100 office and clerical employees.

102. Central relies solely on word-of-mouth recruitment of over-the-road drivers. There is no help-wanted announcement posted to notify incumbent employees in other job classifications who might be interested in transferring and the Company has never advertised for drivers nor used community sources such as the State Employment Service to obtain them.

103. Central has a reputation in the Charlotte area black community of not providing equal employment opportunity for blacks. This reputation has the effect of deterring qualified blacks from applying for traditionally white jobs such as driver.

104. There is a pool of qualified black truck drivers in the Charlotte area that have not sought work at Central because of its reputation and lack of recruitment effort.

105. Central relies mainly on word-of-mouth recruitment of office and clerical personnel. For example, between January 1, 1969 and September 3, 1970, there were 26 clerical hires at Central's general office. However, the Company placed only five clerical job orders with the North Carolina State Employment Service and four of those were placed after this suit was filed. All five orders stated higher qualifications than the Company generally expects, such as previous work experience required. Six blacks and seven whites were referred by the State Employment Service but there is no indication how many of the individuals actually followed through by applying. However, one black and one white refer-

ral were hired. The black was hired on August 21, 1969, nine days after the filing of this lawsuit.

106. This Court takes judicial notice of the 1970 census figures published by the United States Department of Commerce which show that 24 percent of Mecklenburg County, 22 percent of Guilford County and 22 percent of the population of North Carolina are black.

107. All applicants for driving jobs at Central are required to take a series of written tests, including:

(a) the Claims Department test in which 70 out of a possible 100 is "normal minimum";

(b) the traffic and driving knowledge test in which 40 of 57 is "normal minimum";

(c) the federal regulations test in which 40 of 55 is "normal minimum".

108. Central has no passing cutoff on any of these tests and post-July 2, 1965 white applicants with scores as low as 60 on the claims department test, 31 on the traffic and driving knowledge test, and 35 on the federal regulations test have been hired as over-the-road drivers. The determination of what in fact is a disqualifying score is at the discretion of the Central personnel office on an individual by individual basis.

109. Central has never undertaken a validation study to determine if any of their pre-employment tests in any way measure the ability of an applicant to do the work for which he is applying. Central is unable to say whether there is any relationship between test scores and subsequent performance on the job.

110. The following are instances of test scores for two white and two black applicants for driving jobs at Central:

| NAME | RACE | DATE OF TEST | NUMERICAL SCORE | MARKING |
|------|------|--------------|-----------------|---------|
| Robert Green | W | 10–13–65 | 82 | "C–Average" |
| Sam Clark | N | 11–29–65 | 82 | "D–Poor" |
| Marcus Black | N | 4–13–66 | 76 | "F–Failure" |
| Howard Money | W | 6– 1–66 | 72 | "Poor" |

Central was unable to give any explanation for the difference in result descriptions.

111. The Court finds that the seniority provisions with respect to over-the-road drivers were not instituted or maintained for racial purposes or motives, and that these provisions are racially neutral and lawful on their face. Nevertheless since black employees, because of their race, have historically and traditionally been excluded from higher-paying driving jobs, the collective bargaining agreements which do not permit transfer with seniority carryover perpetuate the effect of the past discriminatory hiring. The consequence of that policy is that blacks have not been able to accumulate such seniority. Thus, those black employees, regardless of service and competence, will remain perpetually beneath their white contemporaries in the traditionally white over-the-road driver classification for all purposes except fringe benefits.

112. The effect of the collective bargaining provisions is to discourage incumbent black employees from seeking traditionally white driving jobs.

113. Since Central's black Maintenance Shop employees have historically been assigned initially only to the garageman classification, the job and departmental seniority system utilized by Central and Local 71 in the Maintenance Shop carries forward the effect of that past discrimination. The consequence of that policy is that blacks have not been able to accumulate seniority in higher-paying, more desirable parts clerk, mechanic helper and mechanic jobs, while

contemporaneously hired whites were able to accumulate such seniority. Thus, those black employees, regardless of service and competence, remain perpetually beneath their white contemporaries in the traditionally white classifications for all purposes except fringe benefits.

114. Prior to December 1, 1958, Central hired blacks on its Greensboro dock only as dockworkers or stevedores, while all whites working on the dock were hired as checkers. Starting on December 1, 1958, the dockworker-stevedore classification was eliminated at the Greensboro terminal, and the jobs of stevedores and checkers were merged. Those blacks who were qualified were reclassified as checkers. Under the applicable collective bargaining agreement all of the white checkers were allowed to keep this seniority for all purposes. The former dockworkers-stevedores were not allowed to keep their seniority except for fringe benefits and went below the whites on the seniority list for all other purposes.

115. Prior to February 1961, Central hired blacks on its Charlotte dock only as dockworkers or stevedores, while all whites working on the dock were hired as checkers. Between February 1961 and July 1967, the jobs of stevedore and checker were merged and dockworker-stevedore classification was phased out at the Charlotte terminal and those blacks who were qualified were reclassified as checkers. Under the applicable collective bargaining agreement, all of the white checkers were allowed to keep their seniority for all purposes. The former dockworkers-stevedores were not allowed to keep their seniority except for fringe benefits and went below the whites on the seniority list for all other purposes.

116. Beginning in 1966, black employees at Central's Charlotte terminal on numerous occasions, through petitions, letters, meetings and grievances, sought to have Local 71 allow a vote on the merging of the dock and checker classification seniority at the Charlotte terminal.

117. The Attorney General asserts that Local 71 and Local 391 have failed to represent adequately the interest of Central's black dock employees. The locals dispute this assertion and the evidence on this issue is in conflict. In light of the change made in the 1970 Carolina City Agreement, providing for terminal seniority, the court deems it unnecessary to make a finding on this issue.

118. On April 1, 1970, after this lawsuit was filed, Central and Local 71 and Local 391 amended their collective bargaining agreement to provide for terminal seniority rather than checker classification seniority for purposes of bidding and layoff.

119. Defendant Local 710 based in Chicago and representing only the West Board over-the-road drivers has at no time induced, encouraged or discouraged any employee from transferring or attempting to transfer to any position, job or classification. At no time has Local 710 refused to admit to membership any individual because of race. At no time has any official or agent of Local 710 been present as witness to or had knowledge of any specific act of discrimination in employment because of race nor has any grievance by or on behalf of any black employee been presented to, filed with or made known to agents or officials of Local 710.

120. The Carolina City Agreement for 1967–1970 provides that city drivers, peddle drivers, switchers and checkers shall be paid the same hourly rate. The 1970–1973 Carolina City Agreement also provides for hourly rates which are the same for city drivers, peddle drivers, switchers and checkers. However, it, like the 1967–1970 Agreement, further provides for a guaranteed 45 hour work week for peddle drivers, whereas, city drivers, switchers and checkers are guaranteed a 40 hour work week.

121. The average earnings in the traditionally white driver classifications are consistently higher than those in checker and switcher classifications. For 1968

and 1969 the average figures are as follows:

| 1968 | Average Earnings |
|---|---|
| Over-the-road East-Line Drivers | $10,593.95 |
| Over-the-road West-Line Drivers | $10,407.97 |
| **Charlotte Terminal** | |
| Peddle Drivers | $ 9,223.01 |
| City Drivers | $ 7,952.74 |
| Checkers | $ 7,455.01 |
| Switchers | $ 6,673.58 |
| **Greensboro Terminal** | |
| Peddle Drivers | $ 9,135.72 |
| City Drivers | $ 8,154.59 |
| Switchers | $ 7,782.25 |
| Checkers | $ 7,268.07 |

| 1969 | Average Earnings |
|---|---|
| Over-the-road East-Line Drivers | $10,875.04 |
| Over-the-road West-Line Drivers | $10,823.31 |
| **Charlotte Terminal** | |
| Peddle Drivers | $ 9,409.23 |
| City Drivers | $ 8,060.38 |
| Checkers | $ 7,525.31 |
| Switchers | $ 7,503.05 |
| **Greensboro Terminal** | |
| Peddle Drivers | $ 9,473.76 |
| City Drivers | $ 8,683.64 |
| Switchers | $ 7,648.73 |
| Checkers | $ 7,375.34 |

122. Over-the-road drivers pay for their own meals on the road. For income tax purposes, a reasonable deduction of $7.00 per day for 260 days a year, or $1,820 a year is allowed. Central does not, however, provide meals as part of compensation to any of its employees.

123. Central's over-the-road drivers are dispatched on a first-in, first-out "wheel" basis. However, seniority is determinative in bidding for in the 13 shuttle driver jobs which are the highest paying and best driving positions. For example, in 1969, the shuttle drivers averaged $11,616.25.

124. Central and Local 71 and Local 391 have since the filing of this suit engaged in the following practices in a good faith attempt to comply with the requirements of Title VII:

(a) Central has hired six black clerical employees since the filing of this suit. The government was unable to offer evidence of any black being rejected for a clerical position subsequent to the filing of the lawsuit.

(b) Subsequent to this Court's Preliminary Injunction Order of October 15, 1970, Central has employed 12 additional over-the-road drivers. All have been black. The Company also has told the Court that it has informed two other qualified blacks that they will be offered the next over-the-road vacancies as they occur.

(c) Local 71 and Local 391 proposed in the 1970 negotiations that terminal seniority replace classification seniority in bidding under the Carolina City Agreement and that individuals be allowed to transfer by bid between the Carolina City Agreement and the Carolina Road Agreement. The multi-employer Association of Carolina Trucking Companies objected and negotiations became deadlocked on this issue. As an alternative to a strike, the deadlock was submitted to the National Negotiating Committee for the industry which ruled for the union changes under the Carolina City Agreement but failed to rule on the transfer issue. The union throughout the negotiations proposed transfer between the two contracts.

(d) The 1970 Carolina City Agreement now provides for bidding based on terminal seniority rather than classification seniority for jobs under that Agreement. With the exception of the government's proposal that the Central's city and peddle driver lists be merged in order to give greater opportunity to incumbents who transfer from one clas-

sification to another, the government concedes the 1970 Carolina City Agreement as applied to Central is in conformity with the requirements of Title VII.

(e) Local 71 and Local 391 in the 1970 Carolina Automotive Maintenance Agreement negotiations proposed bidding between classifications and departments by posting all vacancies for seniority bid. The multi-employer Association objected but finally agreed to a one-time opportunity for garagemen to upgrade to helper. This proposal provided limited mobility to garagemen although it falls far short of what Local 71 and Local 391 requested.

III. *Summary*

125. Central has failed or refused to consider, hire and transfer blacks to driving positions on the same basis as whites have been considered, hired and transferred. Blacks who have asked to be hired or transferred to driving jobs have either had their requests ignored on how to apply by Company officials, or asked to meet conditions that whites have not been required to meet.

126. Central has failed or refused to consider and initially hire blacks for positions in the Maintenance Shop other than as garagemen. Whites, on the other hand, with no mechanic experience were repeatedly hired over the years into the more desirable mechanic helper jobs and trained by Central to be mechanics. Garagemen is currently an all-black classification at Central. The blacks presently employed as garagemen are "frozen" into that classification and forced to sacrifice all seniority for work opportunity purposes if they desire to upgrade.

127. The various collective bargaining agreements entered into by Central and defendants Local 71, Local 391 and Local 710, although racially neutral and lawful on their face, perpetuate the past discriminatory hiring practices by not permitting black employees covered by the City Agreement to transfer to road driver jobs under the Over-the-Road Agreement and by not permitting black garagemen under the Maintenance Agreement to transfer to Mechanic and Mechanic helper jobs under the same Agreement or to road driving jobs under the Over-the-Road Agreement with carryover seniority for other than fringe benefits. This means that blacks who transfer to a traditionally white road driver or mechanic job will remain perpetually beneath their white contemporaries for seniority purposes in the traditionally white positions.

128. Central has failed or refused to consider and hire blacks for office and clerical positions on the same basis as whites have been considered and hired. At least two qualified black applicants were rejected for employment at a time when whites with lesser qualifications were hired. In addition, the Company has followed a pattern over the years of hiring whites directly out of high school with little or no work experience and training them for clerical positions. Blacks were not offered such opportunities until the eve of trial.

129. This Court makes no Findings as to whether Local 71 and Local 391 have engaged in any racial discrimination except to the extent that they were parties to collective bargaining negotiations of seniority provisions which have the effect of perpetuating Central's discriminatory hiring and transfer policies and practices as referred to in Paragraph 127.

CONCLUSIONS OF LAW
JURISDICTION

1. This Court has jurisdiction of this action under the provisions of Section 707(b), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6(b).

2. The Attorney General of the United States is authorized to institute this action on behalf of the United States under Section 707(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6(b) to obtain relief against a pattern and practice of resistance on the part of the defendants to the full enjoyment of the rights to equal employment opportunity

secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

3. The defendant Central is an employer within the meaning of 42 U.S.C. § 2000e(b) and is engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(h).

4. Defendants Local 71, Local 391 and Local 710 are labor organizations within the meaning of 42 U.S.C. § 2000e (d) and are engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(e).

## DISCRIMINATORY PRACTICES

■ 5. The crucial issue in determining liability and entitlement to relief under Title VII of the Civil Rights Act of 1964 is defendant's employment practice up until the time the lawsuit was filed. While a defendant's more recent practices may have bearing upon the nature of appropriate relief, they do not affect the determination of whether the defendant previously violated Title VII. United States v. International Brotherhood of Electrical Workers, Local No. 38, 428 F.2d 144, at 151 (6th Cir. 1970), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); Cypress v. Newport News General and Nonsectarian Hospital Association, 375 F.2d 648 (4th Cir., 1967).

■ 6. In cases under Title VII of the Civil Rights Act of 1964, "statistics often tell much and Courts listen". The following statistics establish a prima facie showing that Central has discriminated in hiring on the basis of race in violation of Title VII. Parham v. Southwestern Bell Telephone Company, 433 F.2d 421 (8th Cir., 1970); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir., 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971); Bing v. Roadway Express, Inc., 444 F.2d 687 (5th Cir., 1971); Lea v. Cone Mills Corp., 301 F.Supp. 97 (M.D.N.C.1969), aff'd, 438 F.2d 86 (4th Cir., 1971); United States by Mitchell v. Hayes International Corp., 415 F.2d 1038 (5th Cir., 1969); United States v. Sheet Metal Workers, Local 36, 416 F.2d 123 (8th

Cir., 1969); Cypress v. Newport News General and Nonsectarian Hospital Association, *supra.*

(a) Prior to this Court's Preliminary Injunction Order of October 15, 1970, Central had never employed a black among its 287 over-the-road drivers. The Company had hired 107 white road drivers between July 2, 1965 and October 15, 1970.

(b) Central has never hired a black directly into a city or peddle driving position. The Company has never employed a black among its 25 city and peddle drivers at the Greensboro terminal. Central has only two blacks among its 47 city and peddle drivers at its Charlotte terminal and they worked out of classification for almost 15 months before being classified as drivers in 1957. The Company has hired 24 city and peddle drivers since July 2, 1965, all white.

(c) Central has never hired a black in its Maintenance Shop as other than a garageman. Although since 1965 four blacks have been upgraded, the garageman classification remains all-black.

(d) Central employs approximately 100 office and clerical workers at its general office, and 38 rate and billing clerks at its Charlotte and Greensboro terminals. The Company did not hire its first black clerical employee until June 27, 1966, and between that date and the filing of this lawsuit on August 12, 1969, hired only five black clericals despite a turnover rate in clerical employees of 15 percent a year or more. The Company has never employed a black rate or billing clerk on a regular basis at either terminal.

7. The prima facie case of discrimination in violation of Title VII, 703(a), 42 U.S.C. § 2000e–2(a) established by the statistics and the concentration of Central's black employees into dock, switcher and garagemen jobs is confirmed by evidence that Central has engaged in the following practices:

(a) Numerous qualified black applicants who sought driving jobs at Cen-

tral over the years either had their requests ignored, were given false or misleading information about requirements, opportunity, and application procedures, or were not considered and hired on the same basis that whites were considered and hired.

(b) Numerous qualified black employees who have sought to be upgraded to driving jobs at Central have either had their requests ignored, or have been required to meet terms and conditions not required of whites who have transferred to such driving jobs.

(c) Company officials have stated on at least three occasions that blacks would not be considered for driving jobs.

(d) Central officials admit that all blacks, no matter what their qualifications, hired into the Maintenance Shop, were hired as garagemen. At the same time, whites with no mechanical experience were hired as mechanics' helpers and many were subsequently trained by Central to be mechanics.

(e) At least two qualified black office and clerical applicants at Central were rejected in 1967 while whites with lesser qualifications were hired.

(f) Prior to December 1, 1959 at Greensboro and February 1961 at Charlotte, blacks were employed only as stevedores or dockworkers on Central's dock, while whites were employed as checkers. When the two classifications were merged, the blacks were placed beneath the whites for all purposes determined by seniority except fringe benefits. The seniority lists were not adjusted to allow the blacks to use their prior stevedore seniority for purposes other than fringe benefits until April 1970, more than seven months after this lawsuit was filed.

■ 8. Title VII of the Civil Rights Act of 1964 was designed, "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." Griggs v. Duke Power Company, 401 U.S. 424, at 429–430, 91 S.Ct. 849, at 853, 28 L.Ed.2d 158 (1971).

■ 9. Where a company in the past has refused to consider or hire blacks for over-the-road driving jobs, the requirement that black employees must resign their present positions and forfeit their accrued employment rights in order to be eligible to transfer to over-the-road driving positions perpetuates the past discrimination and results in present and future discrimination in violation of Title VII of the Civil Rights Act of 1964. Bing v. Roadway Express, Inc., supra; Jones v. Lee Way Motor Freight, Inc., supra.

■ 10. Where a company in the past has operated a racially segregated system of employment, by which assignments to particular job classifications were restricted on the basis of race, the continued present reliance on seniority, based on classification or departmental tenure, for purposes of work opportunity, work schedule, layoff and vacation schedule and failure or refusal to provide for transfer to the traditionally white classifications perpetuates the effects of racial segregation and constitutes a present pattern or practice of discrimination against black employees, depriving them of employment opportunities and adversely affecting their status as employees because of their race within the meaning of 42 U.S.C. § 2000e–2(a) (2). Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir., 1971); United States v. Jacksonville Terminal Company, et al., 451 F.2d 418 (5th Cir., 1971); Local 189, United Papermakers v. United States, 416 F.2d 980 (5th Cir., 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed. 2d 108 (1970); Griggs v. Duke Power Company, 420 F.2d 1225 (4th Cir., 1970); rev'd on other issue, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; United States v. Bethlehem Steel Corp., 446

F.2d 652 (2nd Cir., 1971); Quarles v. Philip Morris, 279 F.Supp. 505 (E.D.Va., 1968).

11. The current collective bargaining agreements which do not allow incumbent black employees, assigned to their jobs on the basis of race, to transfer to the previously all-white over-the-road driving positions with seniority retention for bidding and layoff purposes, although racially neutral and lawful on their face, do, when combined with the company's prior hiring practices, constitute an unlawful present inhibition to transfer and result in present and future discrimination in violation of Title VII which is hereby being remedied. The fact that no employee currently has the right to transfer to over-the-road driving positions with seniority carryover does not make the seniority system lawful under Title VII since there is no evidence that whites in the past have been denied driving jobs on the basis of race. United States v. Bethlehem Steel Corp., *supra*; Griggs v. Duke Power Company, *supra*, order entered in compliance with remand, 3 EPD [CCH] ¶ 8093 (M.D.N.C., Dec. 23, 1970); Robinson v. Lorillard Corp., *supra*.

12. The facts that these have traditionally been separate collective bargaining agreements for over-the-road drivers, city employees and garage employee; and that the classifications constitute separate bargaining units do not render the separate job or classification seniority system any less unlawful under Title VII, nor do they diminish the need for relief and the kind of relief required. For Title VII outlaws practices which perpetuate past discrimination regardless of their historical origin and regardless of their motive. United States v. Jacksonville Terminal Company, et al., *supra*. See, Griggs v. Duke Power Company, *supra*, 401 U.S. at 424–430, 91 S.Ct. 849 (1971).

13. The seniority system at Central in effect until April 1, 1970 under the Carolina City Agreement although racially neutral and lawful on its face was unlawful in the context of the history of hiring discrimination. The failure to provide for transfer within classifications under the Agreement by incumbent blacks assigned on the basis of race and the requirement that, when a transfer was permitted by the Company, the transferee went to the bottom of the seniority list in his new classification for all purposes but fringe benefits, perpetuated past discrimination in violation of Title VII. Robinson v. Lorillard Corp., *supra*.

14. The current seniority system at Central's Maintenance Shop under the Carolina Automotive Maintenance Agreement although racially neutral and lawful on its face is unlawful in the context. While a transfer provision was introduced in 1970, which allowed garagemen to upgrade to helper, such opportunity is allowed to each garageman only once during the three-year period of the Agreement. Furthermore, the failure to provide for seniority retention for all purposes for the garagemen who seek to upgrade perpetuates past discrimination in violation of Title VII. United States v. Hayes International Corp., *supra;* Griggs v. Duke Power Company, *supra*.

15. Where a company has traditionally white job classifications, it is unlawful for it to limit notice of future opportunities in such classifications to word-of-mouth recruitment. Likewise, it is unlawful for a company to give false, misleading or incomplete information to blacks, or to fail or refuse to inform blacks of the procedures and opportunities for obtaining employment. Lea v. Cone Mills Corp., *supra;* United States v. Sheet Metal Workers, Local 36, *supra*.

16. In proving a pattern or practice of racial discrimination, evidence of the discriminatory reputation of an employer is relevant and admissible. Such evidence is admissible to show how and why blacks may have been discouraged from applying for traditionally white jobs and how and why some of those who did apply may have been

discouraged from pursuing their applications. It is also admissible because it has a direct bearing on the nature and extent of the "appropriate relief" to which the Government is entitled. Title VII imposes upon defendants an obligation to undertake affirmative action to vitiate effects of a discriminatory reputation in the black community. United States v. Sheet Metal Workers, Local 36, *supra;* Lea v. Cone Mills Corp., *supra;* United States v. Local No. 86, Iron Workers, et al., 315 F.Supp. 1202 (W.D. Wash., 1970) aff'd, 443 F.2d 544. (9th Cir. 1971).

■ 17. A pattern or practice of discrimination is established where it can be shown that (a) a company with virtually all-white job classifications has a discriminatory reputation in the black community; (b) that the company historically has not had blacks participating in these virtually all-white job classifications; and (c) there is a pool of qualified blacks in the community. United States v. Sheet Metal Workers, Local 36, *supra;* Jones v. Lee Way Motor Freight, Inc., *supra.*

■ 18. The continued use of pre-employment tests which are not shown to predict successful job performance, where determination of a passing score is at the subjective discretion of the employer on an individual by individual basis, and which tests have been used in the past to discriminate against blacks is unlawful under Title VII. Griggs v. Duke Power Company, *supra;* Local 53, Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir., 1969).

■ 19. Central, Local 71 and Local 391 subsequent to the passage of the Civil Rights Act of 1964, have negotiated, ratified or become parties to collective bargaining agreements which, although racially neutral and lawful on their face, perpetuate the past discrimination and contribute to the continuation of that system and have therefore intentionally engaged in unlawful employment practices within the meaning of section 707(a) of the Civil Rights Act of 1964,

42 U.S.C. § 2000e-6(a). See Local 189, United Papermakers v. United States, *supra;* Robinson v. Lorillard Corp., 319 F.Supp. 835 (M.D.N.C.1970), aff'd, Robinson v. Lorillard Corp., *supra.*

■ 20. By making and enforcing the collective bargaining agreements with Central which provide for the discriminatory classification and departmental seniority systems and fail to provide for transfer with carryover seniority, Local 71 and Local 391 have violated 42 U.S.C. § 2000e-2(c). Robinson v. Lorillard Corp., *supra;* United States v. Bethlehem Steel Corp., *supra;* Quarles v. Philip Morris, *supra,* 279 F. Supp. at 515, 519.

21. Local 710 historically has represented only a limited classification of employees at Central, West Board over-the-road drivers. No affirmative evidence has been offered against Local 710. Although members of the Affected Class who transfer to the West Board shall be provided by Central with seniority credits for all purposes, the Court in its discretion, concludes that because of its limited connection with Central and in view of Finding of Fact 119, above, no relief is warranted against Local 710.

### EVIDENCE AND PROOF

■ 22. In cases under Title VII, the "intent" required by the statute may be inferred from the defendants' conduct. The statute requires only that a defendant has meant to do what was done; that is, the act or practice must not be accidental. Griggs v. Duke Power Company, 401 U.S. at 432, 91 S.Ct. 849; Robinson v. Lorillard Corp., *supra,* 444 F.2d at pp. 796–797; Local 189, United Papermakers v. United States, *supra,* 416 F.2d at 996–997.

■ 23. Racial discrimination will seldom be admitted by any employer. Evidence of employees' nonpromotional status serves to corroborate a claim of racial discrimination. This evidence becomes particularly significant when no rational reason is offered to rebut the telling inference otherwise established.

Marquez v. Omaha District Sales Office, Ford Division of Ford Motor Company, 440 F.2d 1157 (8th Cir. 1971).

## RELIEF

24. Where a defendant has engaged in a pattern or practice of discrimination on account of race, affirmative and mandatory relief is required in order to insure the full enjoyment of the right to equal employment opportunities. In ordering such relief, a court should not parrot the Act's prohibitions, but should order all affirmative relief which is appropriate to insure the full enjoyment of employment rights. United States v. Bethlehem Steel Corp., *supra*; United States v. Hayes International Corp., *supra*; United States v. Dillon Supply Company, 429 F.2d 800 (4th Cir. 1970); Local 53, Asbestos Workers v. Vogler, *supra*; United States v. International Brotherhood of Electrical Workers, Local No. 38, *supra*.

25. In such cases, "the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, at 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709; Griggs v. Duke Power Company, *supra;* United States v. Dillon Supply Company, *supra;* United States v. Bethlehem Steel Corp., *supra;* Local 189, United Papermakers v. United States, *supra;* Robinson v. Lorillard Corp., *supra;* Quarles v. Philip Morris, *supra*.

26. The Court in ordering relief is seeking to correct the current and future effects of past discrimination and to restore the victims to their rightful status. It therefore is not limited by the prohibition in section 703(j), 42 U.S.C. § 2000e–2(j) against preferential treatment. United States v. International Brotherhood of Electrical Workers, Local No. 38, *supra;* United States v. Sheet Metal Workers, Local 36, *supra;* Jones v. Lee Way Motor Freight, Inc.,

*supra;* United States v. Local No. 86, et al., Ironworkers, *supra*.

27. The scope of the class of employees that has suffered from discrimination on the grounds of race in assignment, transfer, and promotional opportunity includes all blacks initially assigned to checker-stevedore, switcher, garageman or janitor jobs at the Charlotte or Greensboro terminals or maintenance shops.

28. Blacks in the class discriminated against shall be entitled to transfer to future vacancies in over-the-road driving positions on the basis of their competency and terminal or company seniority. In order that these individuals may acquire the "full enjoyment of the rights" secured by Title VII and not be placed forever behind their white contemporaries, they shall be entitled to seniority carryover for all purposes, including employment opportunity on future vacancies, demotions, layoffs and choice of vacation schedule. United States v. Bethlehem Steel Corp., *supra;* Robinson v. Lorillard Corp., *supra;* Griggs v. Duke Power Company, *supra*.

29. The discrimination found illegal here was against a class of persons. It is true that some of the black employees in the Affected Class might not even under the best of systems have been initially assigned to over-the-road driving jobs. But there is no apparent way of knowing that or determining now who they would be. A group remedy is therefore appropriate. United States v. Bethlehem Steel Corp., *supra;* United States v. Jefferson County Board of Education, 372 F.2d 836, 866 (5th Cir., 1966), aff'd on rehearing en banc, 380 F.2d 385 (5th Cir., 1966), cert. denied, Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

30. The 1970 changes in the Carolina City Agreement allow all persons working under the Agreement to transfer to job classifications covered by the Agreement and carry their seniority

for all purposes. These changes combined with a merger of the city and peddle driver lists will allow blacks to compete in all such classifications on an equal basis with their white contemporaries and are therefore as operative at Central consistent with Title VII. However, while not ordering any additional changes in the seniority provisions under the Carolina City Agreement, this Court will retain Jurisdiction in part to insure that any future change the defendant may voluntarily decide on in collective bargaining is consonant with Title VII. Parham v. Southwestern Bell Telephone Company, *supra.*

■ 31. Maintenance Shop employees in the Affected Class shall be entitled to compete for future vacancies in classifications covered by the Carolina Automotive Maintenance Agreement, work schedule and vacation schedule based on their terminal seniority. An employee in the Affected Class who upgrades shall be entitled to carry his terminal seniority for all purposes. The limitation that garagemen be allowed only one opportunity to upgrade during the three-year term of the Agreement is inconsistent with the requirement of Title VII. United States v. Bethlehem Steel Corp., *supra;* United States v. Hayes International Corp., *supra.*

■ 32. In fashioning relief, the ordering of remedial acts such as hiring ratios which will provide for participation by qualified blacks in traditionally white job classifications is appropriate in order to overcome the present effects of past discrimination. Such a ratio shall continue until the consequences of the past discriminatory practices are substantially corrected. Local 53, Asbestos Workers v. Vogler, *supra;* United States v. Local No. 86 et al., Ironworkers, *supra;* United States v. Sheet Metal Workers, Local 10, et al., 3 EPD [CCH] ¶ 8068 (D.N.J., Dec. 1970). See also, Contractors Association of Eastern Pennsylvania v. Secretary of Labor, Shultz, et al., 442 F.2d 159 (C.A. 3, 1971), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95

(1971); Strain v. Philpott, 331 F.Supp. 836 (M.D.Ala.1971).

■ 33. Where defendants' employment practices have been found to violate Title VII and have resulted in economic loss the awarding of back pay may be appropriate. However, there is considerable question of the Attorney General's right to seek back pay on behalf of the individual victims of discrimination. As previously found, defendants have made good faith and even strenuous efforts to remove the effects of past discrimination. There is currently pending in this Court a private class action, Marcus Black v. Central Motor Lines, Civil Action No. 2152, alleging violations of Title VII on account of race, which was filed prior to this suit. No attempt was made by the parties to consolidate the two cases, and this Court by Order of October 19, 1970, agreed to hold that case in abeyance until final disposition of this suit by the Attorney General. In light of the foregoing, the Court concludes in its discretion that no back pay will be awarded in this action. Moreover, regardless of the state of the law, such as it may be, on the finality or presumed finality of findings of fact made in this case respecting Marcus Black and others similarly situated, this Court expressly leaves open for decision in the Marcus Black case all issues presented in that case, including such facts as may for purposes of this action have previously been found in the findings of fact upon which this decree is based. As a pure matter of common sense, the Court expects that he will not be required to listen to the same witnesses repeat the same testimony in the *Black* case, but that hope is a far cry from considering the *Black* issues foreclosed by this judgment.

■ 34. Where, as here, an employer has not recruited in a manner calculated to inform minority group applicants, appropriate affirmative relief of its past discrimination in its hiring practices, appropriate affirmative relief should include an order directing Central

to recruit black applicants in a manner calculated to apprise minority group members of the job opportunities existing at Central. United States v. Sheet Metal Workers, Local 36, *supra;* United States v. United Association of Journeymen Plumbers, Local Union No. 73, 314 F. Supp. 160 (S.D.Ind.1969).

■■■ 35. Other elements of an appropriate decree include record keeping and reporting provisions and retention of jurisdiction. United States v. International Brotherhood of Electrical Workers, Local No. 38, *supra;* United States v. Dillon Supply Co., *supra.*

■■■ 36. Except as specifically set forth in this decree, the Court does not intend to inhibit or interfere with collective bargaining among the defendants.

## DECREE

This action having come on for trial before the Court, the issues having been duly tried, Findings of Fact and Conclusions of Law having been made pursuant to Rule 52, Federal Rules of Civil Procedure, it is hereby ORDERED, ADJUDGED and DECREED:

1. Defendant Central and Defendant Local 71 and Local 391, their officers, agents, employees, successors and all persons in active concert or participation with them or with any of them are permanently enjoined from engaging in any act or practice at Central's Greensboro or Charlotte, North Carolina, facilities which has the purpose or the effect of discriminating against any individual because of his race or color. Defendant Central shall hire, assign, promote, transfer and dismiss employees at its Greensboro or Charlotte facilities without regard to race, and shall not discriminate against any individual at its Greensboro or Charlotte facilities because of his race in any respect of his employment.

2. The class of employees entitled to relief under subdivisions A and B of this Decree shall be all black employees either employed or on layoff at the date of this Decree who were initially hired and assigned by Central at its Greensboro or Charlotte terminals to jobs in the checker-stevedore, switcher, or garageman classifications.

### A. Procedure for Filling Vacancies in the Over-the-Road Driver Classification

3. Within 30 days of this Decree, Central shall inform in writing all members of the Affected Class of their rights under this Decree including the right to transfer to over-the-road driving jobs with seniority carry over as provided in paragraphs 7 and 8 of this Decree. A copy of such letter shall be presented to the United States for approval prior to dispatch.

Members of the Affected Class shall have 30 days after receipt of the letter to express an interest in transferring to an over-the-road driving position. Any member who does not express such an interest within the 30-day period shall be deemed to have waived any right to seniority carry-over to road driver jobs under this Decree. Those members of the Affected Class who have transferred subsequent to the Court's Preliminary Injunction Order of October 15, 1970, and are currently driving shall automatically receive the seniority credits provided by this Decree.

4. When vacancies occur in over-the-road driving positions, Central shall contact the members of the Affected Class who have expressed an interest in transferring in order of their terminal seniority and the most senior individual on the list shall be offered the position if he possesses qualifications to become an over-the-road driver.

When an over-the-road driving job becomes available at the Greensboro terminal, those road drivers previously located at Greensboro and now at the Charlotte terminal shall be allowed to compete for such jobs with members of the Affected Class at Greensboro based on each person's original date of hire.

If any member of the Affected Class rejects an opportunity to transfer to an over-the-road driver position on the East or West Board at the terminal where he

is employed except for illness, he shall be deemed to have waived his right to transfer to that Board under this Decree.

5. All members of the Affected Class who desire shall be entitled to demonstrate their driving skill to qualify for an over-the-road driving job. They shall be allowed a reasonable time period if they desire to familiarize themselves with company equipment prior to demonstrating their driving skills.

6. Central may continue to use its road driving performance test in determining qualifications. However, if any member of the Affected Class who can demonstrate one year tractor-trailer or two years straight truck driving experience or a combination thereof, either in private industry or the Armed Forces, fails such a test, the individual shall be entitled to retake the test if he desires in the presence of a neutral person agreed on by the member of the Affected Class and Central.

7. Members of the Affected Class who transfer to the West Board (Local 710 runs) pursuant to this Decree shall carry their terminal seniority for all bidding purposes and company seniority for all fringe benefits. In future competition for work opportunity, layoff, bid preference and vacation schedule, members of the Affected Class shall compete based on their terminal seniority and other drivers shall compete based on their West Board seniority.

8. Members of the Affected Class who transfer to the East Boards (Local 71 and Local 391 runs) pursuant to this Decree shall carry their terminal seniority for all bidding purposes and company seniority for all fringe benefits and shall compete with incumbent East Board drivers for work opportunity, layoff, bid preference and vacation schedule based on terminal seniority.

9. Members of the Affected Class who transfer to an over-the-road driving position shall have a 30-day probationary period during which they shall have the right to return to their old job without loss of seniority if they do not wish to continue driving. Such a return shall constitute a rejection of an opportunity within the meaning of paragraph 4.

10. Central shall offer the first two over-the-road driver vacancies at the Charlotte Terminal not filled by a member of the Affected Class to Roosevelt Blackwell and Sherman Harris, provided they pass Central's road driving test. They shall be considered to have sufficient prior experience as defined in paragraph 6. If employed they shall be considered as new employees.

11. If no individuals in the Affected Class, or those referred to in paragraph 10, are interested in filling a vacant road driver position within seven days after it has been offered, Central may fill such over-the-road driver vacancies from any other source, including employees not in the Affected Class. For purposes of this paragraph road driver positions filled in accord with paragraph 4 by a road driver previously located at Greensboro and now located at Charlotte shall not be considered a vacancy.

12. Subject to the availability of qualified black applicants, Central shall fill the vacancies described in paragraph 11 in the ratio of at least one (1) black for every one (1) other employee hired for such vacancies. Such obligation shall exist until such time as the number of black over-the-road drivers at Central's Charlotte and Greensboro terminals is approximately twenty (20) percent of the total number of road driver employees in any reporting year provided for in paragraph 28 of this Decree.

13. In determining whether any individual is qualified for an over-the-road driving position, Central may not use any written test of the type previously administered by it unless the test has been validated in accordance with the standards set forth by the Equal Employment Opportunity Commission in its Guidelines on Employee Selection Procedures, issued on August 1, 1970, and any revision thereof. Central may continue to use its road driving performance test in determining qualifications.

## B. *Local Driver Vacancies*

14. Within 30 days of this Decree, Central shall merge its Charlotte terminal city and peddle driver lists.

15. All members of the Affected Class who are working under the Carolina City Agreement and who desire to qualify for a city or peddle driving job shall be allowed a reasonable time period to familiarize themselves with company equipment prior to demonstrating their driving skill.

16. If Central is unable to fill local driver vacancies from incumbent employees as provided in the Carolina City Agreement, it may fill such vacancies from any other source.

17. Subject to the availability of qualified black applicants, Central shall fill vacancies in local driving jobs, not filled by incumbent employees as provided in the Carolina City Agreement, in the ratio of at least one (1) black for every one (1) other employee hired for such vacancies. Such obligation shall exist until such time as the number of blacks in the local driver classification at Central's Greensboro and Charlotte terminals is approximately twenty (20) percent of the total number of employees in local driving jobs in any reporting year as provided in paragraph 28 of this Decree.

18. In determining whether any individual is qualified for a city or peddle driving position, Central may not use any written test of the type previously administered by it unless the test has been validated in accordance with the standards set forth by the Equal Employment Opportunity Commission in its Guidelines on Employee Selection Procedures, issued on August 1, 1970, and any revision thereof. Central may continue to use its road driving performance test in determining qualifications. However, if any member of the Affected Class who can demonstrate one year tractor-trailer or one year straight truck driving experience either in private industry or the Armed Forces fails such a test, the individual shall be entitled to retake the test if he desires in the presence of a neutral person agreed upon by the member of the Affected Class and Central.

## C. *Positions under the Carolina Automotive Maintenance Agreement*

19. All employees covered by the Carolina Automotive Maintenance Agreement shall use their terminal seniority for all bidding purposes, including work opportunity, layoff, bid preference and vacation schedule; and shall use company seniority for all fringe benefits except to the extent that the employees who were required to transfer from Greensboro to Charlotte in the 1967 change of operations will continue to exercise company seniority for layoff purposes. Central may continue in effect its progression, classification and departmental system and the upgrade committee except as may be provided for in paragraph 21.

20. Central shall post a notice of all helper vacancies for seven days during which all garagemen may bid for the position. The garageman with the greatest terminal seniority who bids shall be offered the position.

21. All incumbent garagemen who successfully bid on a helper position shall be entitled to upgrade on a 30-day probationary basis. If not found qualified by the company, they shall be returned to their garageman position without loss of seniority. If qualified, they shall become helpers with all rights as provided in paragraph 19.

22. Subject to the availability of qualified black applicants, Central shall fill all mechanic and mechanic helper vacancies not filled through upgrading in the ratio of at least one (1) black for every one (1) other employee hired for such vacancies in such classifications. Such obligation shall exist until such time as the number of black mechanics and mechanic helpers is approximately twenty (20) percent of the total number of employees in these two classifications in any reporting year provided for in paragraph 28 of this Decree.

D. *Procedure for Filling Office and Clerical Vacancies*

23. Central shall offer Margaret Ross and Mable Ford Fulton the next openings that occur in the office and clerical staff. No back pay is awarded with respect to any office or clerical employee or applicant for office or clerical employment.

24. Subject to the availability of qualified black applicants, Central shall fill all additional office and clerical vacancies, including those at the Charlotte and Greensboro terminals, in the ratio of at least one (1) black for every one (1) other employee hired for office and clerical vacancies. Such obligation shall exist until such time as the number of black office and clerical personnel is approximately twenty (20) percent of the total office and clerical personnel, including the Charlotte and Greensboro terminals in any reporting year as provided in paragraph 28 of this Decree.

25. Central shall undertake an employee recruitment program aimed at the black communities in Charlotte and Greensboro, North Carolina. Such a program shall include contact on a periodic basis but not at intervals greater than semi-annually thereafter with local civil rights organizations such as the Urban League and the National Association for the Advancement of Colored People, and contact local job training organizations, local black universities and local black leaders. Central may also choose in consultation with appropriate officials of the Post Office Department to establish such arrangements with other minority group sources. If such communications fail to develop a sufficient number of qualified applicants to meet the ratios set forth above for each classification of job opportunity, Central shall undertake an advertising program in newspapers or on radio stations directed to and having general circulation in the black community in the immediate geographical area.

26. In recruiting for its management and supervisory positions, Central shall afford equal employment opportunity to all regardless of race. When engaging in college recruiting, Central will, to the extent feasible, include black colleges among those colleges visited.

*Records and Reports*

27. Central shall maintain records of all applications, hiring, assignments, promotions, transfers, disqualifications and dismissals. Defendants Local 71 and Local 391 shall maintain records of grievances filed by Central's black employees at its Greensboro and Charlotte terminals.

28. Within a reasonable time, not to exceed 30 days after April 1, 1972 and every six months thereafter, Central shall serve upon plaintiff reports from its Charlotte and Greensboro facilities showing by terminal or general office, job classification, and race as follows:

A. The total number of employees as of the end of the period.

B. The number of persons hired, and the number of persons terminated during the period.

C. The number of applicants for employment who were not hired during the period. If the individual's application is not pending at the end of the period, the name and address of all black applicants who are no longer under consideration.

D. The name and status of all members of the Affected Class who expressed an interest in transferring to over-the-road driver under this Decree.

E. The period April 1, 1972, through March 31, 1973 and yearly thereafter shall be the reporting year for the purposes mentioned in paragraphs 12, 17, 22 and 24.

Such reports shall also include documentation of the recruitment program undertaken by Central pursuant to paragraphs 25 and 26 of this Decree.

The job classifications required under this provision shall be dock, local driver, over-the-road driver, switcher, clerical, mechanic and mechanic helper, garageman and supervisory. If any person is hired on a casual basis, the report shall so designate.

29. Central and Local 71 and Local 391 shall provide other information relevant to the manner of its compliance with the provisions of this Decree upon request by the Department of Justice or its designee, but such request shall not be made so frequently or in such detail as to impose an unreasonable burden or expense on Central or Local 71 or Local 391.

*Other*

30. In order to obtain greater assurance of compliance by Central with the terms of this Decree, it shall designate an official who will have responsibility for securing compliance with this Decree and specifically, the official designated by it shall review or supervise effectively the review of employment forms and applications and the files of unsuccessful black applicants to more effectively avert or avoid the effects of discriminatory practices.

31. No back pay is awarded against any of the defendants but this provision is without prejudice to the rights of any of the members of the class represented in the suit entitled Black v. Central Motor Lines, C.A. No. 2512, now pending in this Court.

32. Nothing in this Decree shall prevent Central from filling a temporary vacancy in classifications under the Carolina City Agreement or Carolina Automotive Maintenance Agreement by casual employees; provided, however, it is not done in such a manner as to interfere with its obligations under this Decree or its collective bargaining agreements.

33. If in the opinion of the United States there has been a violation of the terms of this Decree, the Attorney General shall notify the party in default in writing in detail of the alleged violation and that party shall have 30 days to correct any violation before the Plaintiff shall bring it to the attention of the Court.

34. Central shall post a copy of this Decree in prominent locations at its Charlotte and Greensboro facilities.

*Retention of Jurisdiction*

35. This Court shall retain jurisdiction of this cause for the purpose of issuing any and all additional orders as may become necessary for the purpose of insuring that equal employment opportunities are provided all employees and prospective employees at Central's Greensboro or Charlotte facilities without regard to race or color, and that all effects of past discrimination based on race or color are eliminated. The defendants or any of them, may move this Court for modification or dissolution of this Decree upon proper showing.

36. Each party shall bear its own costs.